UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY BRAHO, et al., | ) | CASE NO. 5:16-cv-3007 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| LIQUID TRANSPORT CORP., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendant Liquid Transport Corporation and defendant Isaias Castellanos for partial summary judgment (Doc. No. 31 ["Mot."]). Plaintiffs filed their opposition (Doc. No. 38 ["Opp'n"]) and defendants filed a reply (Doc. No. 39 ["Reply"]). For the reasons discussed herein, defendants' motion for partial summary judgment is granted in part and denied in part.

I.  BACKGROUND

This case stems from a motor vehicle accident between plaintiff Tracy Braho ("Braho") and defendant Isaias Castellanos, Jr. ("Castellanos"). On November 18, 2014, Braho was driving eastbound, from Akron to Pennsylvania, on Interstate 76. (Doc. 35, Deposition of Tracy Braho ["Braho Dep."] at 332–35.[1]) On that night, heavy snowing negatively affected driving conditions.

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing system. Where depositions have four pages per sheet, the actual page number is indicated in parentheses following the page identification number.

(*Id.* at 335.) Drivers had slowed down on the interstate because of the weather conditions. (*Id.* at 335–36)

Around 7:15 P.M., Braho was driving in the left lane, closest to the median, around mile marker forty-eight. (*Id.* at 336.) Around that same time, Castellanos was driving next to her in the right lane, pulling a liquid tanker for defendant Liquid Transport Corporation ["LTC"]. (*Id.* at 339.) At that point, Castellanos moved over into the left lane. (*Id.* at 339–40) The back-left side of Castellanos's tanker made contact with the right side of Braho's car. (*Id.* at 340.)

After the accident, both drivers stopped at the next exit. (*Id.* at 343.) A police officer arrived on the scene and cited Castellanos for a lane violation. (*Id.* 352; Doc. No. 39-2, Castellanos Accident Report.) Braho was able to driver her car home after the accident and did not seek medical attention. (*Id.* at 351–53, 355.) Braho testified that she began to suffer adverse physical symptoms the next day, November 19, 2014. (*Id.* at 365.) On that day, while at work, Braho started experiencing headaches and a stiff neck and back. The next day, November 20, 2014, Braho went to the hospital for her symptoms. (*Id.*) At the hospital, Braho was diagnosed with a "cervical strain." (*Id.* at 367.) On a second trip to the emergency room on November 30, 2014, Braho was diagnosed with "post-concussion syndrome." (*Id.* at 369–70.) Despite treatments and surgeries, Braho has continued to experience body stiffness and headaches since the accident. (*Id.* at 392.)

Braho and her husband, plaintiff Ronald Braho ("Ronald"), filed the instant case against LTC and Castellanos.[2] Braho alleges negligence against Castellanos, and vicarious liability, strict liability, and negligence against LTC. Further, Ronald alleges a loss of consortium claim against both defendants. Plaintiffs seek compensatory and punitive damages.

---

[2] State Farm Mutual Automobile Insurance Company was also a plaintiff in this action, but it settled its claims against all defendants and was dismissed. *See* Docket Entry on 12/29/2017.

2

The defendants moved for partial summary judgment on plaintiffs' claims for punitive damages against both defendants, and on plaintiffs' negligent hiring claim against LTC. The motion is fully briefed and ripe for the Court's review.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of, or in opposition to, a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, the Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The nonmoving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The nonmoving party must show "more than a scintilla of evidence" to overcome summary judgment; it is not enough for the nonmoving party to show that there is some "metaphysical doubt" as to material facts. *Id*.

## III. DISCUSSION

In their motion, defendants seek summary judgment as to plaintiffs' claims for (1) negligent hiring, training, and retention, and (2) punitive damages. (Mot. at 230–31.)

### 1. Negligent Hiring[3]

Ohio law recognizes the tort of negligent hiring.[4] *Byrd v. Faber*, 565 N.E.2d 584, 589–90 (Ohio 1991). To establish a negligent hiring claim, the plaintiff must demonstrate: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of the plaintiff's injuries. *Plotner v. Swanton Local. Bd. of Educ.*, 85 F. Supp. 2d 747, 755 (N.D. Ohio 2000) (citing *Staten v. Ohio Exterminating Co., Inc.*, 704 N.E.2d 621, 623 (Ohio 1997)).

The primary issue in a negligent hiring case is whether the employer knew, or should have known, of the employee's criminal or tortious propensities. *Stephens v. A-Able Rents Co.*, 654 N.E.2d 1315, 1319 (Ohio Ct. App. 1995) (citing *Byrd*, 565 N.E.2d at 590). The plaintiff must focus on what the employer knew, not just what the employee did. *Id.* (citing *Byrd*). "If the plaintiff shows facts indicating the employee had a past history of criminal or tortious conduct about which

---

[3] Plaintiffs identify their negligence claim against LTC as one of negligent "hiring, instructing, training, supervising and retaining" its employees. (Doc. No. 1-1, Complaint ["Compl."] ¶ 21.) Under Ohio law, claims for negligent training, instructing, retention, or supervising have the same elements as claims for negligent hiring. *Compare Plotner v. Swanton Local. Bd. of Educ.*, 85 F. Supp. 2d 747, 755 (N.D. Ohio 2000) (citing *Staten v. Ohio Exterminating Co., Inc.*, 704 N.E.2d 621, 623 (Ohio 1997)), *with Lemmon v. Ayres*, 860 F. Supp. 2d 489, 518 (N.D. Ohio 2012), *rev'd and remanded on other grounds by* 517 F. App'x 424 (6th Cir. 2013), (citing *Crable v. Nestle USA, Inc.*, No. 86746, 2006 WL 1555405, at *6 (Ohio Ct. App. June 8, 2006)). For the sake of clarity, the Court will refer to plaintiffs' claim as a negligent hiring claim.

[4] The Court applies Ohio choice of law rules because the case was brought in federal court in Ohio pursuant to diversity jurisdiction. *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)). Further, Ohio choice of law rules direct the Court to apply Ohio tort law to the instant action. *See id.* at 296–99.

the employer knew or should have known, summary judgment is improper and a question of fact is raised." *Id.* Further, "[w]hen determining the foreseeability of a criminal act, a court must look at the totality of the circumstances, and only when the circumstances are somewhat overwhelming can an employer be held liable." *Prewitt v. Alexson Servs., Inc.*, No. 2007-09-218, 2008 WL 3893575, at *6 (Ohio Ct. App. Aug. 25, 2008) (citing *Evans v. Ohio State Univ.*, 680 N.E.2d 161, 173 (Ohio Ct. App. 1996)).

Here, to support their negligent hiring claim, plaintiffs enlisted the expert opinion of one Steven Belyus ("Belyus"), a former Ohio State Highway Patrol Trooper with experience in accident reconstruction and experience with the Federal Motor Carrier Safety Regulations ("FMCSR"). (Doc. No. 32-1, Deposition of Steven Belyus ["Belyus Dep."] at 259–60 (6–13).)

The FMCSR are regulations promulgated by the U.S. Department of Transportation Federal Motor Carrier Safety Administration. 49 C.F.R. § 1.87. The FMCSR apply to motor carriers, drivers, and the commercial motor vehicles they operate to transport freight. The FMCSR make motor carries, like LTC, responsible for any drivers and equipment that operate under their motor carrier operating authority. 49 C.F.R. § 390.11. The FMCSR also require motor carriers to ensure that any potential drivers are fully qualified before they operate a commercial motor vehicle. 49 C.F.R. § 391.11.

Steps required by a motor carrier to ensure a driver's qualification include: conducting an investigation into the driver's driving history by requesting and reviewing state Motor Vehicle Reports ("MVR") and reaching out to previous FMCSR-regulated employers, 49 C.F.R. § 391.23(b); obtaining a medical examiner's certificate to ensure the driver is medically qualified to operate the motor vehicle, 49 C.F.R. §§ 391.23(m)(1), 391.41; ensuring the driver holds a valid

driver's licenses, 49 C.F.R. § 391.23(a)(1); ensuring the driver passes a road test, 49 C.F.R. § 391.31; and conducting an annual review of the driver's driving record, 49 C.F.R. § 391.25.

Belyus's testimony reveals that, prior to his accident with Braho, Castellanos had no accidents while driving with LTC (Belyus Dep. at 273 (63–64)); Castellanos had a valid medical qualification (*id.* at 271 (57)); Castellanos took a preemployment drug test (*id.* at 276 (74)); and Castellanos took a preemployment road test—even though one was not required because he possessed a commercial driver's license ("CDL") for more than one year (*id.* at 273 (64)). Moreover, when asked, "[w]hat in [Castellanos's] application for employment by [LTC] as an independent contractor disqualified him under the [FMCSR]," Belyus responded, "[n]othing would have disqualified him under the FMCSR[.]" (*Id.* at 273 (63).) And when asked, "[w]as [LTC] required by the FMCSR[] to terminate [Castellanos] following the accident with [Braho]," Belyus respond, "[n]o, sir." (*Id.* at 273 (65).).

Belyus also testified that LTC's "vehicle out-of-service rate is better than the national average, and that [its] driver out-of-service rate is better than the national average[,]" and that LTC's current rating with the Department of Transportation is "[s]atisfactory." (*Id.* at 271 (54–55).)

Still, Belyus opined that LTC had information before the accident that "should have raised red flags with [LTC] to do a deeper background investigation." (Belyus Dep. at 269 (47), 273 (63).) Specifically, Belyus pointed to: (1) Castellanos's 2006 arrest and jail sentences for reckless operation, which included alcohol; (2) LTC's failure to provide documentation that Castellanos

participated in a drug and alcohol testing program, as required under the FMCSR; and (3) a 2014 traffic citation for obstructing traffic. (Belyus Dep. at 269 (47–49).)

After reviewing record evidence in the light most favorable to Braho, the Court finds no reasonable juror could conclude LTC is liable for negligent hiring. As stated, the primary issue in a negligent hiring case is whether the employer knew, or should have known, of the employee's criminal or tortious propensities. *Terek v. Finkbiner*, No. 3:14 CV 1391, 2015 WL 5542535, at *5 (N.D. Ohio Sept. 18, 2015). In *Terek*, the court found the motor carrier was not liable for negligent hiring of a driver because the motor carrier "performed all the necessary background checks, tests, and inquiries one would expect of a prospective employer." *Id.* at *5. The motor carrier ran a background check, conducted an MVR, contacted prior employers, submitted the driver to tests, and subjected the driver to a drug test. *Id.* Further, the driver in *Terek* had been a licensed commercial driver before his employment and never had an accident or had his license restricted or suspended. *Id.* In *Terek*, plaintiff's negligent hiring claim stemmed from evidence that the employer ignored the employee's driving record that was more than three years old. *Id.* at *6. In deciding that this evidence did not establish negligent hiring, the court stated, "[employee's] prior three years driving history [would not] indicate to a reasonably prudent person that he would be involved in an accident"—the crux of negligent hiring. *Id.*

Here, like in *Terek*, the record establishes that LTC followed the FMCSR regulations in ensuring Castellanos was fully qualified to drive: LTC ensured that Castellanos had a valid medical qualification (Belyus Dep. at 271 (57)); Castellanos took a preemployment drug test (*id.* at 276 (74)); and Castellanos took a preemployment road test—even though one was not required because

he possessed a CDL for more than one year (*id.* at 173 (64)). Moreover, prior to his accident with Braho, Castellanos had no accidents while driving with LTC. (Belyus Dep. at 273 (63–64).).

Plaintiffs' claim for negligent hiring, like in *Terek*, rests on evidence that LTC disregarded part of Castellanos's driving history. However, the identified reckless operation involving alcohol occurred some nine years before the accident with Braho. Since then, the record indicates that Castellanos was given a preemployment drug and alcohol test before driving for LTC. Further, there is no indication in the record that he ever failed an alcohol or drug test. Further, there is nothing in the record indicating that he was impaired by drugs and/or alcohol when the accident with Braho occurred. Moreover, as stated previously, Braho had never caused any accident while driving with LTC. The 2006 reckless operation does not create a criminal or tortious propensity or make it reasonably foreseeable that Castellanos would get in an accident.

For these same reasons, the fact that LTC failed to provide documentation that Castellanos participated in a drug and alcohol testing program does not create a criminal or tortious propensity or make it reasonably foreseeable that Castellanos would get in an accident. Similarly, one traffic citation in 2014 for obstructing traffic also fails to create a criminal or tortious propensity or make it reasonably foreseeable that Castellanos would get in an accident.

Taken together, the events which Belyus claims should have raised "red flags" do not establish that LTC was negligent in hiring Castellanos as a driver. Taken together these events do not rise to the "somewhat overwhelming" level that is necessary to establish negligent hiring. Conversely, the record establishes that LTC followed the FMCSR regulations in ensuring Castellanos was fully qualified to drive. There is nothing in the record that could lead a reasonable

juror to find that LTC was negligent in hiring Castellanos. Therefore, LTC's motion for summary judgment as it pertains to plaintiffs' fourth claim—negligent hiring—is GRANTED.

2. **Punitive Damages**

Under Ohio law, punitive damages may be awarded in tort claims only upon a finding of actual malice, fraud, or insult on the part of the defendant. *See* Ohio Rev. Code. § 2315.21; *see also Estate of Beavers v. Knapp*, 889 N.E.2d 181, 190 (Ohio Ct. App. 2008). For punitive damages to be appropriate, something more than mere negligence is required. *Estate of Beavers*, 889 N.E.2d at 193. Substantial harm must be a near certain consequence of the defendant's actions. *See Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1234–35 (Ohio 1992), *overruled on other grounds by Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397 (Ohio 1994).

> Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously.

*Motorists Mut. Ins. Co.*, 590 N.E.2d at 1234.

For purposes of punitive damages claims, the Supreme Court of Ohio defines malice as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987). The party seeking punitive damages bears the burden of proving malice with clear and convincing evidence. Ohio Rev. Code § 2315.21(D)(1)(4).

Malice premised on conscious disregard "requires the party to possess knowledge of the harm that might be caused by his behavior." *Laws v. Stevens Transport, Inc.*, No. 2:12-cv-544, 2013 WL 4510395, at *8 (N.D. Ohio Aug. 23, 2013) (quoting *Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1242 (Ohio 1996)). "Because 'it is rarely possible to prove actual malice

otherwise than by conduct and surrounding circumstances,' 'actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross.'" *Id.* (quoting *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 466–67 (Ohio 1989)).

**Liquid Transport Corporation**

Plaintiffs contend that LTC is liable for punitive damages because it ratified the acts of Castellanos. Plaintiffs' contentions rest of the fact that LTC did not immediately fire Castellanos after the accident.

Under Ohio law, a plaintiff can recover punitive damages from an employer who authorizes, participates, or ratifies actions or omissions of an employee who acted with malice. Ohio Rev. Code § 2315.21(C)(1). "Ohio law requires authorization, participation, or ratification by an employer and not just actionable conduct undertaken while in the scope of employment before an award of punitive damages against the employer can be contemplated." *Terek*, 2015 WL 5542535, at *4.

Here, there is no evidence that LTC ratified any malice actions of Castellanos. Plaintiffs claim they have "supplied evidence which supports [LTC's] ratification of . . . [Castellanos's] conduct sufficient to support a claim of punitive damages against the employer." (Opp'n at 441.) However, the only evidence that plaintiffs point to is that LTC allowed Castellanos to drive for another five months after the accident, without any suspension or counseling. (*Id.*)

Under Ohio law, the continued employment of an employee who committed a tort is not, in and of itself, enough to show ratification by an employer. *Fisher v. Hering*, 97 N.E.2d 553, 556 (Ohio Ct. App. 1948). While slight acts of ratification are sufficient to support punitive damages claims, "[r]atification, however, is to be inferred only from acts which evince an intention to ratify,

11

and not from acts which may be readily and satisfactorily explained without involving intention to ratify." *Saberton v. Greenwald*, 66 N.E.2d 224, 231 (Ohio 1946).

Here, there is no evidence that LTC *intended* to ratify Castellanos's actions by retaining him as a driver for five months. Rather, the record shows that LTC might have relied solely on Castellanos's report as their source of information about the accident. (Belyus Dep. at 269 (46–47) (suggesting that LTC only reviewed Castellano's generated accident report).) In that report, Castellanos stated: no one was killed; no one was injured; there were no witnesses; the police were notified, but not on scene; no vehicles were towed; and he was not ticketed. (Doc. No. 39-2 at 453.)[5]

Further, plaintiffs' own expert testified that LTC was not required by the FMCSR to terminate Castellanos following the accident with Braho. (Belyus Dep. at 273 (65)). Nevertheless, Castellanos's contract with LTC was not renewed five months after the accident with Braho. It is unclear from the record whether the contract renewal was in response to the accident, or not. Either way, Castellanos's employment with LTC was terminated five months after the accident with Braho. Retained employment for five months when the gravity of the accident was not immediately

---

[5] This information was corrected to say he was ticketed for not leaving enough room for the car and that police were on the scene.

apparent to the motor carrier does not create the type of malice necessary to establish a claim for punitive damages against an employer.

Thus, LTC's motion for summary judgment as it pertains to punitive damages against LTC is GRANTED because no reasonable juror could find LTC authorized, participated in, or ratified Castellanos's conduct that led to the crash.

**Castellanos**

Plaintiffs contend that they are entitled to punitive damages against Castellanos because he acted with a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm. Plaintiffs point to Castellanos's conduct and the circumstances surrounding the accident to establish actual malice.

First, Braho testified at her deposition that on the day of the accident, around 7:15 P.M., she was driving in the left-hand lane closest to the median. (*Id.* at 333, 335–36.) She testified that the weather and road conditions were "very bad that night" because of approximately four to five inches of snow on the ground and black ice. (*Id.* at 335.) She stated that traffic was driving slowly because of the conditions. (*Id.*)

Around mile marker forty-three, Braho noticed a liquid tanker driven by Castellanos. (*Id.* at 336.) Braho testified that when she first noticed Castellanos's tanker, it was behind her. (*Id.*) Braho further testified that "[h]e was driving erratically and weaving in and out of traffic trying to pass all the vehicles he could." (*Id.*) Next, she testified that, "[h]e was blinking his lights at [her] and beeping his horn alarming [her]." (*Id.* at 337.) She also testified that he was "tailgating" her at times to the point that "[h]is headlights, when he blinked them, his brights on [her], it was going in [her] eyes." (*Id.*) Braho testified that while Castellanos was in the right-hand lane next to her car, "all of a sudden, he just swerved over right in front [her]. There wasn't enough room for him

13

because there was probably about 45 feet there and [she] believe[d] his tanker was probably around 52 feet and he just came on over and he hit [her]." (*Id.* at 339–40.)

Second, a witness to the accident, commercial truck driver Joseph Cochran ("Cochran"), swore in his affidavit that on the day of the accident he noticed a tanker driving "erratically." (Doc. No. 36, Affidavit of Joseph Cochran ¶ 4.) He states the tanker was "weaving in and out of traffic at an excessive speed and manner for the road conditions in a total disregard for the safety of all the other people on the road at the time." (*Id.* ¶ 5.) Cochran states that due to the way the tanker was driving, he was "almost certain that the driver of the [tanker] was going to cause an accident." (*Id.* ¶ 6.) Cochran then recalls that, "[w]hile the [tanker] was in the right[-]hand lane, the driver unexpectedly whipped his wheel to the left and drove into a car traveling in the left[-]hand lane, hitting the car and causing it to lose control." (*Id.* ¶ 7.) Importantly, Cochran states that, "[t]here were no other vehicles in front of the [tanker.]" (*Id.* ¶ 8.)

Defendants implore this Court to disregard both Braho's and Cochran's statements as unreliable. (Reply at 445–47.) Defendants then offer a story of the accident that contradicts both accounts. (*Id.* at 447.) However, defendants have failed to point to any evidence in the record that supports their version of the accident, or any record evidence that shows Braho's and Cochran's versions are inaccurate. As such, defendants have failed to establish that there is no genuine issue of material fact.

Based on the record evidence before this Court, a reasonable jury could find that Castellanos, an experienced trucker, acted with malice when driving erratically in snowy conditions, weaving in and out of traffic, flashing his lights and honking his horn at Braho, and then hitting Braho's car by moving his truck into Braho's lane, despite no cars being ahead of him in his lane. A reasonable juror could conclude that Castellanos intended to cause substantial harm

14

or knew that substantial harm was likely to happen based on his actions. As such, defendants' motion for summary judgment as it pertains to plaintiffs' claim for punitive damages against Castellanos is DENIED.

## IV. CONCLUSION

For the reasons set forth herein, defendants' motion for partial summary judgment is granted in part and denied in part. Defendants' motion for summary judgment on plaintiffs' negligent hiring claim against LTC is GRANTED; defendants' motion for summary judgment on plaintiffs' claim for punitive damages against LTC is GRANTED; and defendants' motion for summary judgment on plaintiffs' claim for punitive damages against Castellanos is DENIED. This case will advance on plaintiffs' negligence claim against Castellanos, seeking punitive damages; plaintiffs' vicarious liability claim against LTC; plaintiffs' strict liability claim against LTC; and plaintiffs' loss of consortium claim against LTC and Castellanos.

**IT IS SO ORDERED**.

Dated: June 25, 2019

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**